RICHARD N. AURSLANIAN
ATTORNEY AT LAW
JEFFERSON CENTRE
5001 MAYFIELD ROAD, #301
~~P.O. BOX 24005~~
CLEVELAND, OHIO 44124
(216) 382-7114

## PLAINTIFFS' EXPERT'S REPORT

Re: Rebecca Hodges, et. al. v. Salvanalle, Inc., et. al.
(d/b/a Everdry of Central Ohio)

U. S. District Court, Northern District of Ohio
Eastern Division
Case No: 1:12 CV 2851

At the request of Plaintiffs' counsel the following is submitted as Plaintiffs' Expert's Report.

### RELEVENT STATUTES

(1) Fair Labor Standards Act (FLSA) 29 U.S.C., Sec. 201 et. seq.
(2) ORC Sec. 4111.

### EXHIBITS

(1) Expert's Resume.

(2) Sample payroll dated 7/15/11 (the pen and ink notations were made during the preparation of this report).

(3) Production Department Pay Scale (the pen and ink notations were made during the preparation of this report).

(4) Excerpts from David Pesec's deposition. (Pesec is in charge of payroll.)

### OTHER RECORDS REVIEWED

(1) Continuation of deposition of Cheryl Nalle, dated 8/6/13.
(2) Continuation of deposition of David Pesec, dated 8/6/13.

NOTE: The records examined for this report were very limited because of time restraints, but appear to be representative.

### ANALYSIS, OPINION AND CONCLUSIONS

Defendants' method of computing an employee's pay is a complicated one. For example the payroll dated 7/15/11 for Curtis Duncan "Exhibit 2" shows the following:

(1) Employee's name, in this case, Curtis Duncan.

(2) <u>Day Rate</u>. In this case $62.00. This rate varies depending on the level of the employee, (see "pay scale", "Exhibit 3").

(3) <u>Hours worked</u> for each of the two weeks in this bi-weekly pay period.

(4) <u>Days worked</u> which is five (5) days in both weeks.

(5) <u>Total</u> which is days worked times day rate or $310.00.

(6) "OT rate" is a misnomer since it appears to have been calculated by dividing the day rate of $62.00 by an assumptive eight (8) hour day, = $7.75 ÷ 2 (half time?) = $3.88. This is the paid drive time referred to in the pay scale, "Exhibit 3". As stated in the same exhibit, "it is not overtime".

(7) <u>Total OT</u> also is a misnomer. It is calculated by multiplying $3.88 x 12.58 hours in excess of 40 = $48.76.

(8) <u>Minimum Wage</u> This is the amount due in minimum wage. For example in week one (1), Duncan worked 52.58 hours, which when multiplied by the State minimum wage of $7.40 per hour, equals $389.12.

(9) <u>Pay</u> The very next column is the amount the employee would have received if not for the minimum wage. It is computed by taking Duncan's day rate, See ¶5 above ($310) plus total "Total OT" (see ¶6 above) or $358.76.

(10) <u>Difference from Minimum Wage</u> which equals $30.36 in week one (1). A similar calculation for week two (2) equals a shortfall from the minimum wage of $17.37.

(11) <u>Check gross amount</u> or the amount paid Duncan this two (2) week pay period is $750.98 (using separate calculations each step of the way comes to $750.95. Using a continuous computer calculation exceeding two decimal places should explain any difference.)

The remaining three (3) columns add nothing to Duncan's pay. The column marked "amount added to day pay" is the sum of "total OT" and "difference from min wage".

NOTE: DUNCAN'S TOTAL HOURS THIS PAY PERIOD: 52.58 + 48.90 or 101.48 x THE MINIMUM WAGE OF $7.40 = $750.98, STRAIGHT TIME ONLY.

Under the FLSA and State wage & hour law Duncan is due additional one-half time due for the hours worked in excess of 40 per week computed thusly:

```
Overtime hours week one (1):      12.58
Overtime hours week two (2):       8.90
Total                             21.48 x $7.40 x ½ = $79.48
```

2

According to my review of the "Continuation of deposition of David Pesec, dated 8/6/13", Curtis Duncan's pay calculation in the paysheet in Exhibit 2, dated July 15, 2011, was made according to a formula in "an electronic spreadsheet that (David Pesec) developed". (*See e.g.,* Pesec deposition, 8/6/13, 81:15-16). This electronic spreadsheet was used "for determining employee compensation." (Pesec deposition, 8/6/13, 84:10). Pesec testified that to calculate employee compensation he would "plug (the numbers) into the spreadsheet and leave it to do the calculation." (Pesec deposition, 8/6/13, 121:21-22). Pesec's formula was in continuous use from 2011 through the present. (Pesec deposition, 8/6/13, 97:15-24).

## CONCLUSION

The defendant companies appear to have a policy of paying straight time only to not only Duncan but to other employees similarly situated. If, in fact, the defendants paid time and one-half for overtime hours, what better place to so state if not on the "Production Department Pay Scale", "Exhibit 3".

There are two things that control Duncan's pay on the payroll dated 715/11: Hours worked times the minimum wage, and it comes to straight time only.

Respectfully submitted,

Richard N. Aurslanian    Date: 10/30/13

3

# CURRICULUM VITAE

## OCTOBER, 2013

*RICHARD N. AURSLANIAN*
*JEFFERSON CENTRE*
*5001 MAYFIELD ROAD, #103*
*CLEVELAND, OHIO 44124*
*(216) 382-7114*

**EDUCATION**

Ohio State University, B.S. Degree in Business

Cleveland Marshall Law School, now known as Cleveland State University College of Law. Graduated, 1968.

**RELEVANT EMPLOYMENT**

Wage & Hour Division, U. S. Department of Labor, 30 years. Retired July, 1991.

Duties included making investigations, computing back wages, interviewing employees, negotiating compliance and constantly evaluating employment situations. I prepared cases for civil and criminal prosecution and have been qualified in court cases as an expert in Wage & Hour matters. On May 9, 1988 I received a "Special Achievement Award" signed by the Regional Administrator.

**MATTERS LITIGATED**

- White Collar Exemptions – Supervisory, Administrative and Professional
- "Off the Clock"
- Reconstruction of Hours
- Willful Violations
- Attorney Fees
- Statute of Limitations
- Child Labor
- Civil Money Penalties
- Minimum Wage Violations
- Overtime Wage Violations
- Many Others

EXHIBIT 1

## CURRENT PROFESSIONAL AFFILIATIONS

- Ohio State Bar Association
- Cleveland Bar Association

## COURTS OF PRACTICE

- Federal District Court
- Federal Court of Appeals
- Common Pleas Court

## TALKS AND PUBLICATIONS

- Participate in Wage & Hour Seminars
- Various Newsletter Articles

• • •

on calls
Trive drive time
payroll 7-15-11

Day Rt/8
÷.5

Sample P/R

| Name | Day Rate | Hours worked | Days Worked | Total | OT Rate | Total OT | Minimum wage pay | pay | difference from Min wage | Check gross Amount | day pay | Amount to add to day pay | Hourly rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ferguson, james | 90 | 39.52 | 4 | $360.00 | $5.63 | $ - | $292.42 | $360.00 | $ (67.58) | | | | |
| | | 48.70 | 5 | $450.00 | $5.63 | $ 48.94 | $360.38 | $498.94 | $ (138.56) | $ 858.94 | $810.00 | $ 48.94 | 9.74 |
| moody, dallas | 60 | 52.43 | 5 | $300.00 | $3.75 | $ 46.63 | $388.01 | $346.63 | $ 41.38 | | | | |
| | | 49.08 | 5 | $300.00 | $3.75 | $ 34.06 | $363.22 | $334.06 | $ 29.15 | $ 751.22 | $600.00 | $ 151.22 | 7.40 |
| duncan, curtis | 62 | 52.58 | 5 | $310.00 | $3.88 | $ 48.76 | $389.12 | $358.76 | $ 30.36 | | | | |
| | | 48.90 | 5 | $310.00 | $3.88 | $ 34.49 | $361.86 | $344.49 | $ 17.37 | $ 750.98 | $620.00 | $ 130.98 | 7.40 |

EXHIBIT 2

Ex.1537

# Production Department Pay Scale

Starting Pay is $65.00 per day.

Your pay will go up as you take your level tests.

- LEVEL 1 You are started at Level 1 and must take this test within 15 days.
- LEVEL 2 TEST=$68.00 PER DAY
- LEVEL 3 TEST=$70.00 PER DAY
- LEVEL 4 TEST=$72.00 PER DAY

Level test 2-4 may be taken as soon as you feel ready.

Anytime you work more than 40 hours a week, you will be paid drive time. This is an hourly rate determined by totaling your daily rate and bonus.

This is not overtime. It is ½ of what your hourly rate would be. This averages to between $3-5/hour.

For example: You work 45 hours in one week. The extra 5 hours is your drive time marked as premium time on your paycheck. This is your drive time. This means you can get between 20 and 50 extra a week just for riding in the truck.

Attendance Bonus=
$25.00 per month for 30 days consecutive attendance.
$50.00 per month of 60 days consecutive attendance.

*Co policy obtained through discovery (Bates stamped copies obtained through discovery) (Taken from personnel file of one of the opt in ßs)*

Y:\OPFiles\Recruiting & Training\Training Info\Production\Insert Production Hire Packet Here!\production unique forms.rtf

EXHIBIT 3

Page 76

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

REBECCA HODGES, et al.,
    Plaintiffs,
-vs-
SALVANALLE, INC., et al.,
    Defendants.

Case No. 1:12 CV 2851

Judge Patricia Gaughan

VOLUME II

**DEPOSITION OF DAVID PESEC,**

a Defendant herein, called by the Plaintiffs as upon cross-examination pursuant to notice and pursuant to the Rules of Civil Procedure, taken before me, Joan C. O'Donnell, Registered Professional Reporter, a Notary Public in and for the State of Ohio, at the offices of Halligan & Lang Co., LPA, located at 1149 East Main Street, Ashland, Ohio, on the 6th day of August, 2013, at 1:02 p.m.

O'DONNELL & McGHEE, LLC
Registered Professional Reporters
13 Park Avenue West, Suite 502
Mansfield, OH 44902
(419)522-9700

Page 77

APPEARANCES:

FOR THE PLAINTIFFS

Mr. Joseph F. Scott
Mr. Ryan A. Winters
SCOTT & WINTERS LAW FIRM, LLC
Suite 1325
815 Superior Avenue East
Cleveland, OH 44114
(216)650-3318
jfscld@yahoo.com

FOR THE DEFENDANTS

Ms. Brian J. Halligan
HALLIGAN & LANG CO., LPA
1149 East Main Street
P.O. Box 455
Ashland, OH 44805
(419)289-2555
bhalligan@halliganlanglaw.com

ALSO PRESENT

Ms. Cheryl Nalle

Page 78

PLAINTIFF'S EXHIBITS:

2 -- spreadsheet calculations -- two (2) pp.

3 -- Hodges timecards -- fourteen (14) pp.;
Cole Easterling timecards -- two (2) pp.;
John Guerrera time cards -- four (4) pp.;
Johnathan Gheen timecards -- two (2) pp.;
Charity timecards -- one (1) page;
Christina Stenski timecard -- one (1) page;
Tammy timecard -- one (1) page;
Aaron Tipton timecard -- one (1) page;
Jacob Brown timecards -- seven (7) pp.;
Ashley timecards -- two (2) pp.;
Brad Filius timecards -- one (1) page;
Brian Diffenbaugh timecards -- one (1) page;
Joseph Shirk timecards -- two (2) pp.;
Tammy Tackett-Vesper timecards -- one (1) page;
Tom Tackett timecard -- one (1) page;
Curtis Duncan timecards -- twenty (20) pp.;
Patrick Yoxtheimer timecards -- three (3) pp.;
Matthew Williams timecards -- one (1) page;
Andrew Reece timecards -- four (4) pp.;
Jason Berry timecards -- two (2) pp;
Abby Stake timecards -- two (2) pp;
Loney Ray Murphy timecards -- eight (8) pp;
Chris Scott timecards -- five (5) pp.;
Laurale Murphy timecards -- three (3) pp;
Dallas Moody timecards -- fourteen (14) pp.
Carole Bender timecards -- five (5) pp.

5 -- handwritten payroll worksheet 6/6/09 -- one (1) page

6 -- handwritten payroll worksheet 4/6/10 -- one (1) page

7 -- handwritten payroll worksheet 4/23/10 -- one (1) page

8 -- handwritten payroll worksheet 1/27/10 -- one (1) page

Page 79

PLAINTIFF'S EXHIBITS FROM NALLE DEPOSITION:

1 -- U.S. Department of Labor Fact Sheet #23 -- two (2) pp.

2 -- email thread, Becky Hodges to/from mannymaul@basementwaterproofer.com -- four (4) pp.

4 -- copies of timecards for Charity -- two (2) pp.

8 -- payroll worksheet for James Ferguson and Curtis Duncan -- one (1) page

EXHIBIT 4 (1)

Page 80

1  MR. SCOTT: We're here for the continued deposition
2  of Mr. David Pesec being taken in the matter of Rebecca
3  Hodges, et al. versus Salvanalle, Inc., et al. This matter
4  is pending the United States District Court for the Northern
5  District of the Ohio before the Honorable Judge Patricia
6  Gaughan.
7  **DAVID PESEC**
8  being first duly sworn or affirmed, was deposed and said as
9  follows:
10  **CROSS-EXAMINATION**
11  BY MR. SCOTT:
12  Q. Mr. Pesec, when last we met on July 26th, it was my
13  understanding you were trying to gather some records for us.
14  A. We're still in the process.
15  MR. HALLIGAN: Just let him ask the question.
16  Q. Have you had a chance to copy the timecards that we had
17  here the last time?
18  A. We have some here. Some are still being copied.
19  Q. Okay. Can you just identify for us what we have here
20  with us today.
21  A. We have about a quarter of the employees. Okay?
22  MR. HALLIGAN: I thought you said three quarters.
23  A. Three quarters, three quarters, you're right.
24  Q. Of the employees' timecards?
25  A. No, of the employees -- the Plaintiffs. Okay?

Page 81

1  Q. I see.
2  A. We're putting them for you in chronological order by
3  employee.
4  Q. Okay. What we're talking about there is, you're putting
5  in chronological order --
6  A. Correct.
7  Q. -- the timecards by employee?
8  A. Correct.
9  Q. And you're about three fourths of the way through that
10  process?
11  A. Correct.
12  Q. Okay. What other records have you brought here with you
13  today?
14  A. I have -- and for the life of me I can't remember where
15  I put it -- the electronic spreadsheet that I developed to
16  help me enter the information into the payroll system, into
17  the Intuit system.
18  Q. You brought that with you today?
19  A. Yes, the formulas on it.
20  Q. Is there a time period that that spreadsheet covers?
21  A. Basically, it would cover from when I started doing it,
22  which would have been sometime in 2011, probably about
23  halfway through there to the current period.
24  Q. Okay. Through the present?
25  A. Yes.

Page 82

1  Q. Okay. Do you have a copy of that that I can have
2  today?
3  A. I know I brought it with me.
4  MR. HALLIGAN: Here it is.
5  THE WITNESS: No, that's not it, Mr. Halligan.
6  There's a copy that I know -- you just gave me the copies.
7  MS. NALLE: We'll figure it out.
8  THE WITNESS: They're here somewhere. Okay?
9  MR. HALLIGAN: Did you leave it in my office?
10  THE WITNESS: Maybe I did. They're the ones that
11  were stapled. They're here.
12  MR. SCOTT: I'd like to go through those with you
13  today if we could.
14  THE WITNESS: Excuse me a minute. I know exactly
15  where I put them.
16  (A recess was taken from 1:27 p.m. to
17  1:29 p.m.)
18  Q. Mr. Pesec, do you have with you the --
19  MR. HALLIGAN: I just handed it to you. Just hand
20  it to him. Okay?
21  THE WITNESS: Yeah.
22  Q. -- the spreadsheet? And can I keep this copy?
23  A. Yes.
24  Q. So you've handed me a two-page document, and I take it
25  this goes side by side --

Page 83

1  A. Um-hum.
2  Q. -- if you will; that it's actually one document that's
3  more than eight and a half inches wide.
4  MR. HALLIGAN: Can we mark it?
5  MR. SCOTT: Yeah, okay. We'll mark this as 2.
6  Q. Mr. Pesec, showing you what we've marked as Plaintiff's
7  Exhibit No. 2, that's the electronic spreadsheet record that
8  you brought here with you today. And is this the formulation
9  that you told me about the last time that you --
10  A. Yes.
11  Q. -- developed for determining --
12  MR. HALLIGAN: Let him finish the question before
13  you answer.
14  Q. -- for determining employee compensation? Is that what
15  this is?
16  A. That is correct.
17  Q. Okay. Let's go through this and just see if we can
18  figure out what all these columns are. The first column is
19  name. That would be the name of the employee, obviously. Is
20  that right?
21  A. Correct.
22  Q. The second column is day rate. Would that be the
23  individual day rate for that particular employee?
24  A. Correct.
25  Q. The number 138 is there now. Does that represent

EXHIBIT 4 (2)

Page 84

1 anything or is that just sort of a placeholder for this
2 exhibit?
3 A. That was the employee who I used his current day rate.
4 Q. Okay. In order to print off what we have here as
5 Plaintiff's Exhibit No. 2, did you work off an actual example
6 and then zero out the information?
7 A. That is correct.
8 Q. Okay. And the -- what appears above the numbers is, I
9 assume, some sort of code or formulation that you used to
10 develop the program for determining employee compensation.
11 Is that right?
12 A. Correct.
13 Q. Okay. Let's look at the hours worked column on Exhibit
14 2. We have what looks like the equals sign, employee,
15 exclamation mark, D, 10.
16 A. Correct.
17 Q. What does that formulation tell us?
18 A. That indicates you would go to the employee's name tab
19 on the worksheet and pull what value is located in column D
20 10.
21 Q. So there's a worksheet that this refers to?
22 A. A tab, yes.
23 Q. And is that also stored in electronic format?
24 A. Yes, it is.
25 Q. Is that something that's been printed out?

Page 85

1 A. I forgot to do that, so no.
2 Q. That's something that we can get printed out?
3 A. Yes.
4 Q. Okay. The next column, it says days worked, and there
5 we have A, parenthesis, employee, exclamation mark, dollar
6 sign, B, dollar sign, 3, colon, dollar sign, B, dollar sign,
7 9, end parenthesis. Correct?
8 A. Correct.
9 Q. And what does that tell the program to do?
10 A. That instructs it to go out and basically count the
11 number of values in that range from B 3 to B 9.
12 Q. Would those values also be on the same worksheet that
13 hours worked column refers to?
14 A. Yes.
15 Q. Okay. The next column is captioned "total," and we have
16 the equals sign, B, 3, asterisk, D, 3. Is that correct?
17 A. That is correct.
18 Q. Okay. What does that tell us?
19 A. That would take the value located in this worksheet
20 column B 3, multiply it by D 3.
21 Q. All right. So the asterisk is a multiplication sign?
22 A. Correct.
23 Q. Okay. And, again, that's pulling from the same
24 worksheet as hours worked column and days worked column.
25 Correct?

Page 86

1 A. No.
2 Q. Okay. What worksheet is that pulling from?
3 A. The one you're looking at here.
4 Q. I see. Okay. Next, we have hourly rate, and here we
5 see equals, I, F, parenthesis, C, 3, equals, zero, comma,
6 zero, comma, paren, D, 3, asterisk, dollar sign, B, dollar
7 sign, 3, end parentheses, slash, C, 3, close parentheses.
8 Have I read that correctly?
9 A. I believe so, yes.
10 Q. Okay. And what does that formulation tell us to do?
11 A. Look at the value contained on this printout here that
12 you're looking at, column C 3. If it is zero, put a zero in
13 there. Otherwise, take the value in column D 3, multiply it
14 by the column in B 3, and divide it by the value in C 3.
15 Q. And that's B 3 and C 3 of this worksheet. Is that
16 true?
17 A. That is correct, yes.
18 Q. And what does I F stand for?
19 A. It's a conditional. It indicates if the condition is
20 true, it does a comparison. That's why it's stated if C 3
21 equals zero, it puts a zero there. Otherwise, it performs
22 the referenced calculation.
23 Q. And what is it you're trying to show under this hourly
24 rate column?
25 A. The actual hourly rate worked by the employee.

Page 87

1 Q. So a regular rate, if you will? Not their day rate, but
2 their hourly rate?
3 A. Their hourly rate based upon the number of hours they
4 worked over that week, correct.
5 Q. Okay. And is it comparing -- the zero, what is that
6 derived from? What is the comparison there that would give
7 us a value of zero?
8 A. The employee didn't work that week.
9 Q. Okay. And you're dividing by the total number of
10 hours. Is that correct?
11 A. That is correct.
12 Q. So if an employee worked in excess of 40 hours, the
13 value would be whatever the number is in excess of 40 hours.
14 Correct?
15 A. It would be however many hours they worked that week.
16 Q. Including overtime hours?
17 A. Including overtime hours.
18 Q. Okay. The next column is captioned "minimum wate." I
19 assume that's supposed to be minimum rate.
20 A. Wage.
21 Q. Oh, wage, okay. And then the abbreviation there is the
22 pound sign, R, E, F, exclamation point. Right?
23 A. That's correct. That indicates there's an error.
24 Q. Okay. Tell me about that. Why do we get this error
25 message?

EXHIBIT 4 (3)

Page 96

1  Q. Okay. Would M 3 and M 4 correspond to the same
2  employee?
3  A. Yes.
4  Q. All right. So that's each week in a two-week pay
5  period?
6  A. Correct.
7  Q. Okay. The next column, we have day pay. Correct?
8  A. Correct.
9  Q. And here we have equals, E, 3, plus, E, 4?
10 A. Correct.
11 Q. All right. Again, pulling data from the spreadsheet?
12 A. Um-hum.
13 Q. And it's telling the program to add columns E 3 and
14 E 4?
15 A. Correct.
16 Q. And what would day pay be? Would that be their day rate
17 for each of the two-week periods in the pay period?
18 A. That would be the total days worked times their day
19 rate, correct.
20 Q. So if their day rate was, say, here at $62 and they
21 worked five days, it would be $310 dollars for each week in
22 the pay period?
23 A. Assuming that they both worked five days each pay
24 period.
25 Q. Right. And in that hypothetical, if they worked two

Page 97

1  five-day weeks at a $62 day rate for each week, it would be
2  $310 for each week?
3  A. That is correct.
4  Q. So the value we would see in that column under the
5  example I just gave you would be $620?
6  A. Yes.
7  Q. Okay. And then next we have amount to add to day pay,
8  and here we have another formulation, equals, P, 4, minus,
9  paren, E, 3, plus, E, 4, close paren. Is that correct?
10 A. That is correct.
11 Q. Okay. And what is this indicating? What is this
12 intending to do for adjusting employee compensation?
13 A. That would basically include what's needed to bring them
14 to minimum wage plus any overtime pay.
15 Q. Okay. All right. And this is the formula that you
16 developed and you have used consistently since you developed
17 this formula. Correct?
18 A. Yes.
19 Q. Through and including the present?
20 A. Correct.
21 Q. All right. And I'm sorry, I know you told me at the
22 beginning of this deposition you think that you started using
23 this in 2011 or 2010.
24 A. I believe 2011.
25 Q. Okay. But you took over payroll duties prior to that

Page 98

1  time, didn't you?
2  A. Yes.
3      MR. HALLIGAN: Can we go off the record a second?
4      MR. SCOTT: Sure.
5      (An off-the-record discussion was held.)
6  Q. Did you use -- you took over payroll duties prior to
7  2011. Is that correct?
8  A. That is correct.
9  Q. Did you use a different formulation when you took over
10 payroll duties?
11 A. Prior to that, they were done manually, and I cannot say
12 how the numbers were calculated or how they were derived. It
13 was basically anybody who was filling in to do that process.
14 Q. Okay.
15 A. We just keyed what they were. I made adjustments if
16 necessary or it looked wrong to the system.
17 Q. And the adjustments you would make would be with an eye
18 towards making sure that the employee was paid at least
19 minimum wage for all hours worked?
20 A. That, and also, if necessary, in terms of bonuses or
21 anything like that, yes.
22 Q. Well, let's ask you. Since you raised that issue, let
23 me ask you that. Now, first of all, when you generate
24 payroll for each pay period, are you the only person within
25 the organization entering values into the accounting software

Page 99

1  for the purposes of generating employee paychecks?
2  A. Yes.
3  Q. Okay. And is there any check or oversight on your work
4  to make sure that all information, such as hours worked, have
5  been appropriately entered into the system?
6  A. No. It would be the employee themselves verifying that
7  the check was correct.
8  Q. Okay. How do you adjust, if at all -- well, let me ask
9  you this: How do you pay bonus pay and commission pay that
10 might be earned by an employee?
11 A. Those would be added to -- they would be a manual
12 addition to the total pay value so that they would be
13 calculated.
14 Q. All right. Is it part of your -- have you written into
15 your program a methodology for including bonus pay and
16 commission pay --
17 A. No.
18 Q. -- into the compensation?
19 A. No, I have not.
20 Q. All right. So the only way those values get entered is
21 by you somehow overriding this program?
22 A. Adding additional values, yes.
23 Q. And I'm sorry. Where do you do that in this program?
24 For instance, say an employee makes $50 in bonus pay for one
25 of their weeks during a pay period. How would that be

EXHIBIT 4 (4)

Page 120

1  What was the number? 52 ...
2      MR. HALLIGAN: From the exhibit, 55.28. The
3  earlier one was 52.58.
4  Q. Okay. All right. Well, let's just use the numbers you
5  have in front of you there, Mr. Pesec.
6      MR. HALLIGAN: On Nalle Exhibit 8 then?
7      MR. SCOTT: Yeah, Nalle Exhibit 8.
8  Q. Let's just look at the numbers you have in front of
9  you. So in the first week, he worked how many hours?
10 A. According to this, 55.28.
11 Q. Okay. And you divide that into what to get the hourly
12 rate?
13 A. Into the -- into the -- 55.28 divided by the 310.
14 Q. Okay, 310. I see what you're doing.
15 A. Right. Which would give you the hourly rate. If it's
16 under minimum, you bump it to minimum. Otherwise, you use
17 whatever the minimum happens to be.
18 Q. Okay. So we have 55.28 divided by 310?
19     MR. HALLIGAN: That's not right. It's 310 divided
20 by 55.
21     MR. SCOTT: Okay.
22     THE WITNESS: That's why I put things into a
23 spreadsheet.
24 Q. Okay. And that gives us about $5.61 an hour?
25 A. Divided by two.

Page 121

1  Q. Divided by two. It gives us $2.80.
2  A. That can't be right then.
3      MR. HALLIGAN: Just answer the question as best you
4  can.
5      THE WITNESS: Okay.
6  A. The numbers apparently do not add.
7  Q. Okay. Do you know if the hourly rate is determined by
8  dividing the day rate by eight?
9  A. Should not be, no.
10 Q. Okay.
11 A. It should be determined exactly as the other spreadsheet
12 did it.
13 Q. Let's try it a different way. Let's try a hypothetical
14 situation. If we have a day rate of $62 per day for an
15 individual who works five days and in that time worked 50
16 hours for that week, okay, so basically ten hours a day for
17 five days --
18 A. Okay.
19 Q. -- how would you determine their pay under those
20 circumstances? What would be the formulation?
21 A. I'd plug it into the spreadsheet and leave it do the
22 calculation.
23 Q. Okay. If the rate of pay for all hours worked was less
24 than minimum wage, how would you adjust the compensation?
25 A. It would be brought up to minimum wage.

Page 122

1  Q. Okay. How would you then determine overtime pay?
2  A. I'd have to go back and consult the spreadsheet. But,
3  again, if we've got it here, okay, it would be whatever their
4  hourly -- their effective hourly rate is divided by two.
5  Q. Okay. Let me ask you this: You have your formulation
6  in front of you.
7  A. Um-hum.
8  Q. Is there anywhere in that formulation that would allow
9  an employee to be paid one and a half times minimum wage for
10 any overtime hours?
11 A. I suppose it is possible. I would have to look at it,
12 but, again, I would be hard pressed to comment yes or no on
13 that.
14 Q. As you look at your formulation as you sit here today,
15 can you show me anywhere in your formulation that would
16 provide an employee with compensation at the rate of one and
17 a half times minimum wage for all overtime hours worked?
18 A. I would have to spend some time going through it. I
19 wouldn't be able to answer that question right now.
20 Q. Okay. Let me ask you this: If we use the formulation
21 that you brought here with you today and we plug in different
22 scenarios, different values based upon what employees
23 actually worked, since that formulation was adopted by
24 Salvanalle, that's going to show us what they were actually
25 paid and how that pay was determined. Correct?

Page 123

1      MR. HALLIGAN: Objection.
2  A. I would assume so, yes.
3  Q. To the best of your knowledge?
4  A. To the best of my knowledge, yes.
5  Q. Let me just show you a few more records that we had
6  previously marked, and then we're going to take a little
7  break here.
8      I don't want to mark this again, but I'm showing you
9  what was marked as Deposition Exhibit 10 in Miss Nalle's
10 deposition. I'm just going to ask you, have you ever seen a
11 daily attendance record like that before?
12 A. Not that I recall.
13 Q. Do you know if Salvanalle kept daily attendance records
14 for its employees?
15 A. If they did, that would be up to each individual
16 department. I would not have seen this.
17     MR. SCOTT: Let's just take a ten-minute break, if
18 we could, here.
19     MR. HALLIGAN: Sure.
20         (A recess was taken from 2:33 p.m. to
21          3:03 p.m.)
22 BY MR. SCOTT:
23 Q. Mr. Pesec, I want to hand you -- these are records that
24 were produced for us the last time, and we've gone ahead and
25 marked them as 5, 6, 7 and 8. They're all kind of the same

EXHIBIT 4 (5)